**THE EPILEPTIC FOUNDATION, et. al., Plaintiffs,**

v.

**CITY AND COUNTY OF MAUI, et. al., Defendants.**

**No. CIV. 02–00343 ACK/KS.**

United States District Court, D. Hawai'i.

Oct. 9, 2003.

As Amended Feb. 25, 2004.

---

Andre S. Wooten, Honolulu, for Epileptic Foundation.

Judith M.E. Williams, Dept. of the Prosecuting Atty., County of Maui, Wailuku, HI, James Takayesu, Dept. of the Corp. Counsel, County of Maui, Wailuku, HI, for John Buck, Roxanne Teshima, Glen Correa.

Brian T. Moto, Moana Monique Lutey Ramaya, Victoria J. Takayesu Hamilton, Department of the Corporation Counsel, County of Maui, Wailuku, HI, for Maui, City & County of, Department of Parks and Public Recreation.

Moana Monique Lutey Ramaya, Victoria J. Takayesu Hamilton, Department of the Corporation Counsel, County of Maui, Wailuku, HI, for Floyd Miyazono.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND REINSTATING IN PART PLAINTIFFS' CLAIMS UNDER CHAPTER 489

KAY, District Judge.

This matter comes before the Court on Defendants City and County of Maui, Department of Parks and Public Recreation ("Maui County" or "Parks and Recreation"), and John Buck's (collectively "Defendants") Motion for Summary Judgment, filed September 12, 2003.[1] Plaintiffs the Epileptic Foundation of Maui ("EFM"), Glen Mabsenn,[2] Joe Collins and Ozella Scott (collectively "Plaintiffs") filed their Memorandum in Opposition on September 25, 2003 ("Memo. in Opp.").[3] Defendants

---

1. Defendants waited until the afternoon of the last day (a Friday) of an enlarged dispositive motions period to move for summary judgment. The proximity to trial necessitated a concurrently-filed Ex Parte Motion to Shorten Time for Hearing. The Court granted Defendants' Ex Parte Motion, believing this case appropriate for review under the standard for summary judgment, but does not condone Defendants' delay. The hearing was set for October 7, 2003, to provide Plaintiffs with as much time as practicable to meaningfully respond to Defendants' Motion for Summary Judgment.

2. The spelling of "Mabsenn" continues to vary. Although "Mabson" appears to be the correct version, the Court, in the interest of consistency, will adhere to the misspelling used in the caption for the Second Amended Complaint. The Second Amended Complaint also improperly named the County of Maui as the "City and County of Maui." Again, the Court will list the parties as named in the controlling caption.

3. Plaintiffs' Memo. in Opp. was due September 24, 2003. Although any tardiness is discouraged (and, indeed, prohibited), a one-day

replied on October 3, 2003.[4] The Court heard argument on October 7, 2003. For the following reasons, the Court GRANTS in part and DENIES in part summary judgment in favor of Defendants and RE-INSTATES in part Plaintiffs' claims under chapter 489.

## BACKGROUND

### I. Factual History

The Court has twice discussed the facts of this case at length. *See Epileptic Found. of Maui v. City & County of Maui,* Civ. No. 02–00343 (D. Haw. filed August 8, 2003) [*August Order*]; *Epileptic Found. of Maui v. City & County of Maui,* Civ. No. 02–00343 (D. Haw. filed March 11, 2003) [*March Order*].[5] The dangers of redundancy notwithstanding, Defendants' Motion demands a third detailed recounting—set in the light most favorable to Plaintiffs—to determine what, if any, genuine issues of material fact remain.[6]

EFM, a nonprofit corporation, hosts an annual "Epilepsy Awareness Event" at Kalama Park in Kihei, Maui, to raise funds for the organization. Kalama Park is a public park maintained by Parks and Recreation. EFM has successfully held its event at Kalama Park for the past five years. (Defendants' Ex. "M," at 71:15–19).

The 2002 Epilepsy Awareness Event was scheduled for the eleventh of May. There is some dispute as to whether that date was obtained by blind lottery or assigned by Maui County at EFM's request. Defendants assert that EFM "did not participate in a lottery to obtain the May 11, 2002 date." (Affidavit of John L. Buck, III ("Buck Aff.") ¶ 3, attached as Defendants' Ex. "T"); *see also* Defendants' Ex. "B"; Maui County Code § 10–1–12(d). Plaintiffs maintain the EFM "won the date of May 11, 2002, for a fund-raising event through fair competition in the Maui County lottery for Kalama Park use dates." (Declaration of Glen Mabsenn ("Mabsenn Decl.") ¶ 1).[7] However the date was obtained, the parties agree that sometime in early 2002, EFM received an application (number 1479) for a permit to use Kalama Park on May 11, 2002.[8] (Buck Aff. ¶ 4); (Mabsenn Decl. ¶ 4).

delay is hardly epochal—particularly considering the expedited schedule for the present matter. After submitting what should have been their complete statement in opposition, however, Plaintiffs filed a Declaration of Joe Collins ("Collins Decl. I"), on September 27, 2003, and a facsimile of a second Declaration of Joe Collins ("Collins Decl. II"), after 6:00 p.m. on September 29, 2003.

4. Defendants' Reply was due September 29, 2003. Defendants lodged their Reply and an Ex Parte Motion to Enlarge the Time to Reply on October 2, 2003. Defendants, by their counsel, averred that Plaintiffs' delay in filing and serving their opposition papers prevented the timely submission of a Reply. The Court granted Defendants' Ex Parte Motion and has considered their Reply.

5. The Court incorporates the *March Order* and the *August Order* by reference.

6. The facts recounted herein are undisputed unless otherwise noted. Unsupported disagreements and disagreements as to immaterial issues are either noted in passing or simply ignored. Mere allegations are denominated as such.

7. Defendants argue that Mabsenn's Declaration should be disregarded because it contains several argumentative and conclusory paragraphs. Defendants are correct that many of the statements in the declaration are not properly presented. Rather than disregard the entire declaration for the failure of a few paragraphs, however, the Court will simply separate factual statements from legal conclusions and consider the former. The declarations submitted in favor of Defendants' Motion for Summary Judgment are, too, not entirely free of improper conclusions. *See, e.g.,* Affidavit of Floyd Miyazono ("Miyazono Aff.") ¶ 7, attached as Defendants' Ex. "V." The Court offers Defendants the same leeway granted Plaintiffs.

8. Plaintiffs argue that Buck circled wrong "event type," Type IV, on application 1479. (Collins Decl. I ¶¶ 5–7). Plaintiffs appear to

By letter addressed to Scott and dated February 11, 2002, Buck confirmed that Parks and Recreation had reserved Kalama Park on May 11, 2002, for the Epilepsy Awareness Event. (Defendants' Ex. "B"). The letter further informed EFM that in order to receive final approval for the event, Parks and Recreation needed certain supporting documentation by March 15, 2002.[9] A second letter to Scott of even date informed EFM that "[c]rafters will not be allowed at your event." [10] (Defendants' Ex. "C"). This restriction may conflict with a statement Buck made to Mabsenn sometime in February authorizing "vendors," provided that EFM "was in charge of all of the items being sold[ ] and ... getting more than 51% of the money from items sold ...." [11] (Mabsenn Decl. ¶ 18).

Mabsenn returned the application, which listed "fund-raising" as the purpose for the event, and the release, acknowledgment and indemnification form on March 13, 2002.[12] (Defendants' Ex. "D"). Mabsenn also tendered checks made out to Parks and Recreation for the rental fee and the cleaning deposit. (Plaintiffs' Exs. 4, 5). Parks and Recreation deposited the checks and issued a receipt dated March 20, 2002. (Plaintiffs' Ex. 3). Neither Floyd Miyazono, then the Director of Parks and Recreation, nor Buck, then the District Supervisor, signed the application.[13]

On March 25, 2002, Buck, by letter to Mabsenn, advised EFM as to the status of its application.[14] According to the letter, several necessary documents remained

be correct, see Maui County Code §§ 10–1–3, 10–1–5(c), attached as Defendants' Ex. "L," although their argument is neither properly presented nor material to the present matter. Plaintiffs' application should have been designated as "event Type III." This would not have altered the applicability of § 10–1–12(d) or the restrictions contained therein, however. See Maui County Code § 10–1012(d). The foregoing observation is informational only and is not intended to be the binding law of the case.

9. Buck requested several documents, including the permit application, a "release, acknowledgment and indemnification" form, a $100.00 custodial deposit, a $150.00 rental fee, a detailed layout of the event and a comprehensive cleanup plan. (Defendants' Ex. "B")

10. Although Mabsenn maintains that he did not receive the second letter, he does not contest its mailing or content. See Mabsenn Decl. ¶¶ 9–10. Scott, the addressee, is not only a member of EFM's Board of Directors, (Defendants' Ex. "G"), she is also Mabsenn's mother and resides with him in South Kihei, (Defendants' Ex. "A," at 10:3–22). Furthermore, Plaintiffs represented to the Court that Scott was actively involved in the application process for the May 2002 event. (Second Amended Complaint ¶¶ 15, 18, 33, 57–59). The Court relied, at least in part, on that involvement and her interaction with Buck to find that Scott had standing in this action.

See August Order, at 13. Plaintiffs cannot now claim that it was unreasonable for Buck to communicate with EFM through Scott.

11. The difference between the terms "vendors" and "crafters" may be real or merely semantic. Seeing only semantic differences at present, the Court uses "crafters" interchangeably with "vendors."

12. As submitted, the application included use dates for May 11, 2002, November 9, 2002, and January 2, 2003. (Defendants' Ex. "D"). Parks and Recreation struck the latter two dates from the application. (Defendants' Ex. "F").

13. Plaintiffs concede that application 1479 was not signed by either Buck or Miyazono but note that it was signed by an unknown permit clerk named "Leimomi" on March 20, 2002. Defendants argue that applications do not become permits until signed by the Parks and Recreation Director and District Supervisor. (Buck Aff. ¶ 6); (Miyazono Aff. ¶ 7). That may be so, but whether applications must be signed by a particular individual (or individuals) to become permits presents a question of law, not fact, and one that the Court need not resolve at this time.

14. Mabsenn is the Executive Director of EFM, and there is no question that he received the March 25, 2002 letter from Buck.

outstanding, including the event layout, a Hawaii Department of Heath Food Permit for each food vendor and a detailed clean-up plan. *See* Defendants' Ex. "F." Mabsenn responded by providing additional, although incomplete, information.[15] (Defendants' Ex. "G"). The record does not contain a reply from Buck.

Sometime thereafter, Mabsenn sent Buck an undated facsimile, which provided in relevant part:

> Here is the list per our conversation[:]
> 1. Silent Auction of Robert Lyn Nelson Paintings
> 2. Quilts (bed spreads) that are donated for fund-raising.
> 3. Rave Jewelry donated to EFM.
> 4. Will notify[,] for your approval, if any other items are donated for fund-raising.
>
> Please understand that this is not a Craft's [sic] fair, but a fund-raiser . . . .

(Defendants' Ex. "H"). There is no evidence regarding the nature of the conversation referenced in the facsimile or Buck's reply, if any, to the same. But the facsimile appears to indicate that EFM proposed to include only the above-designated craft vendors at the May 11, 2002 event, and that the event would not otherwise be a craft fair.

Nothing further transpired until Buck notified EFM on May 7, 2002, that the

original permit had been "misfiled."[16] (Mabsenn Decl. ¶ 19); (Buck Aff. ¶¶ 8-9). Faced with the prospect of losing their right to use Kalama Park on May 11, 2002, Plaintiffs submitted a second application (number 1609). The application was dated May 7, 2002, and signed by Mabsenn. (Defendants' Ex. "I"). The application requested the use of Kalama Park and Pavilion on May 11, 2003, for an "epileptic awareness" event.[17] *Id.* Buck and Miyazono signed the application on May 9, 2002.

The next day, EFM (per Mabsenn) agreed to a "Special Condition," which recited that "the permit issued for the use of Kalama Park on May 11, 2002, does not and shall not include an activity deemed to be a 'Gift and craft fair.'" (Defendants' Ex. "J"). Mabsenn claims that he signed this document "under duress." (Mabsenn Decl. ¶ 22).

The event, without craft vendors, was held on May 11, 2002.[18] EFM officers and members arrived that morning to find Kalama Park "filthy" and in disarray. (Mabsenn Decl. ¶¶ 26-31). EFM also discovered that the Kalama Park Pavilion had been rented to another group, thereby preventing EFM from making full use of the park.[19] *Id.* ¶ 33.

When asked about the condition of the park, Buck replied, "You niggers are dirty anyhow. Clean the park yourself."[20]

---

**15.** Plaintiffs maintain that EFM provided Parks and Recreation with a detailed layout of the event, including craft vendor locations, sometime in February 2002. (Collins Decl. I ¶ 8). The only layout produced, however, is a hand-drawn, largely illegible diagram dated either March 22, 2002, or March 22, 2003. (Plaintiffs' Ex. 5).

**16.** Plaintiffs claim that they were not informed of the missing permit application until May 9, 2002. The evidence, even viewed in the light most favorable to Plaintiffs, supports May 7, 2002, as the notification date.

**17.** No event type was indicated on permit application number 1609.

**18.** Buck allowed food vendors and an auction for the Robert Lyn Nelson paintings. The May 10, 2002 agreement notwithstanding, other vendors arrived the morning of the event intending to sell their wares. Buck informed these vendors that they would not be allowed to set up shop. (Mabsenn Decl. ¶ 25).

**19.** The factual statement accompanying this note was not presented before.

**20.** Mabsenn, Scott and Collins—each of whom are of African–American ancestry—witnessed the racial slur repeated above. As Defendants argue, there is some disagreement

(Collins Decl. I ¶18); (Mabsenn Decl. ¶27); (Defendants' Ex. "P," at 98:8–13). EFM members, with the assistance of two Maui Police Department officers assigned as security for the event, cleaned Kalama Park. (Mabsenn Decl. ¶¶45, 47). Parks and Recreation offered the nominal and belated assistance of a single employee later that afternoon. *Id.* ¶48.

Plaintiffs surmise that the exclusion of craft vendors caused EFM to lose over $75,000 in donations.[21] *Id.* ¶40. This in turn reduced or completely eliminated several educational programs, including EFM's annual "First Aid to Epilepsy and Seizure Control" class for the Maui County Fire Department and its biannual presentation to new Maui County Police Department recruits. *Id.* ¶¶41–44.

According to Plaintiffs, other groups received more favorable treatment. The evidence offered in support of that claim is neither well organized nor entirely consistent. Cobbled together as best can be done, however, it appears that at least two organizations held craft fairs at Kalama Park in 2001. *See* Plaintiffs' Exs. 9, 11. In addition, there is some evidence that "Children Helping Children" and the "Whale Foundation" (alternatively referred to as the "Pacific Whale Foundation") held craft fairs at the park in 2003. (Mabsenn Decl. ¶¶34, 36, 38). Finally, the Wailea Canoe Club held a three-day event called "Kihei Sea Fest," which included a craft fair, in July 2003.[22] *Id.* ¶35; (Plaintiffs' Ex. 8). Plaintiffs maintain that the foregoing groups were allowed to hold gift and craft fairs while EFM was denied that privilege because several of EFM's officers and directors are of African–American ancestry.

## II. *Procedural History*

The *August Order* granted in part and denied in part Defendants' Motion to Dis-

---

among Plaintiffs as to what Buck actually said, *compare* Mabsenn Decl. ¶27, *with* Collins Decl. I ¶18 *and* Defendants' Ex. "P," at 98:8–13, and Buck denies making the above-quoted or any similar statement, (Buck Aff. ¶23). At this stage in the litigation, however, the Court must recount the facts in the light most favorable to Plaintiffs, without regard to credibility assessments. *E.g., Nabozny v. Podlesny*, 92 F.3d 446, 455 (7th Cir.1996).

21. This figure is up markedly from the Complaint, Proposed First Amended Complaint, First Amended Complaint and Second Amended Complaint, each of which alleged $45,000 in lost donations.

22. "Kihei Sea Fest" appears to have been an annual fund-raising event co-sponsored by Maui County and held at Kalama Park. *See* Plaintiffs' Ex. 8, 10, 12–17. By letter dated August 4, 2003, however, Glenn T. Correa (the current Director of Parks and Recreation) notified the Wailea Canoe Club:

> [I]t has been determined that more than 85% of the activity taking place at the so-called Sea Fest was an Arts and Crafts Fair. It makes this event an Arts and Crafts Fair and not a special event. This is in violation of the Rules and Regulations regarding Arts and Craft Fair Shows.
> I am sorry but I must inform you and your organization that from this date forward, if you hold any other activity or special event, you will not be allowed to have an Arts and Crafts show as part of your function. Because of our Rules and Regulations regarding Arts and Craft Fair show[s] and recent litigation against the County, has [sic] forced us to take this position.

(Plaintiffs' Ex. 16). Plaintiffs point to the allowances apparently granted the Kihei Sea Fest as evidence of unfavorable treatment. Unlike Epilepsy Awareness, however, Kihei Sea Fest appears to have been co-sponsored by Maui County, (Plaintiffs' Ex. 16), and, therefore, a Type II event. *See* Maui County Code § 10–1–3. The Director of Parks and Recreation may reserve dates and sites for Type II "gift and craft fairs at any site on any date" simply by "calendaring them in advance on the department's master calendar." Maui County Code § 10–1–12. The foregoing observations are informational only and are not intended to be the binding law of the case.

miss Plaintiffs' Second Amended Complaint and allowed Plaintiffs' ten days to file a Third Amended Complaint in a manner consistent with the Order.[23] *Id.* at 89. Plaintiffs did not amend their Complaint, and Defendants answered on August 21, 2003.[24] Defendants filed their Motion for Summary Judgment on September 12, 2003. The issues have been fully briefed and counsel were heard at argument on October 7, 2003.

## STANDARD

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment is therefore appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."[25] Fed. R.Civ.P. 56(c).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case. A genuine issue of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[26] *Thrifty Oil Co. v. Bank of America Nat'l Trust & Sav. Ass'n,* 310 F.3d 1188, 1194 (9th Cir.2002) (quoting *Union Sch. Dist. v. Smith,* 15 F.3d 1519, 1523 (9th Cir.1994)) (internal citations omitted). Conversely, where the evidence "could not lead a ra-

tional trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

The moving party has the burden of persuading the Court as to the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The moving party may do so with affirmative evidence or by "'showing'—that is pointing out to the [Court]—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. All evidence and reasonable inferences drawn therefrom are considered in the light most favorable to the nonmoving party. *See, e.g., T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987). So, too, the Court's role is not to make credibility assessments. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. *Id.* at 250–51, 106 S.Ct. 2505.

Once the moving party satisfies his burden, however, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" as to a material issue of fact precludes summary judgment. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Matsushita*

---

**23.** The causes of action discussed *infra* excepted, the *August Order* dismissed Plaintiffs' claims with prejudice.

**24.** Plaintiffs were given leave to amend to plead facts in support of their claim for injunctive relief. Having failed to do so, that remedy is now foreclosed.

**25.** Affidavits based on personal knowledge and setting forth facts as would be admissible

at trial are evidence. Fed.R.Civ.P. 56(e). Legal memoranda and oral argument are not evidence and do not create issues of fact. *See British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir.1978).

**26.** Disputes as to immaterial issues of fact do "not preclude summary judgment." *Lynn v. Sheet Metal Workers' Int'l Ass'n,* 804 F.2d 1472, 1478 (9th Cir.1986).

*Elec.,* 475 U.S. at 586, 106 S.Ct. 1348; *California Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987). Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. *Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir.2002); *see also T.W. Elec. Serv.,* 809 F.2d at 630. The nonmoving party must instead set forth "significant probative evidence tending to support the complaint." *T.W. Elec. Serv.,* 809 F.2d at 630. Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

## DISCUSSION

### I. *Title VI*

Plaintiffs' first count arises under Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d to 2000d–7 ("Title VI"). Title VI provides in relevant part:

> No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d (1994). This section creates a private cause of action. *Alexander v. Sandoval,* 532 U.S. 275, 279, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001).

■ To state a Title VI claim for damages, "a plaintiff need only allege that (1) the entity involved is engaging in racial discrimination; and (2) the entity involved is receiving federal financial assistance." *Fobbs v. Holy Cross Health Sys. Corp.,* 29 F.3d 1439, 1447 (9th Cir.1994), *overruled in part on other grounds by Daviton v. Columbia/HCA Healthcare Corp.,* 241 F.3d 1131 (9th Cir.2001). To prevail on a Title VI claim, however, a plaintiff must prove (1) that he is an "intended beneficiary of the federally-funded program the defendants … participated in," *Wrenn v. Kansas,* 561 F.Supp. 1216, 1221 (D.Kan.1983); *accord Otero v. Mesa County Valley Sch. Dist. No. 51,* 470 F.Supp. 326, 329–30 (D.Colo.1979); *cf. Fobbs,* 29 F.3d at 1447, and (2) that the defendant intentionally discriminated against him in violation of the statute, *Alexander,* 532 U.S. at 280, 121 S.Ct. 1511; *Fobbs,* 29 F.3d at 1447; *Smith v. University of Wash. Law Sch.,* 2 F.Supp.2d 1324, 1336 (D.Wash.1998).

■ The *March Order* allowed Mabsenn's cause of action to proceed against Maui County but dismissed Plaintiffs' Title VI claims in remaining part. *Id.* at 37. This dismissal was with prejudice, except as to Scott, *id.,* and Plaintiffs' Second Amended Complaint realleged a Title VI claim on her behalf. Upon review of the Second Amended Complaint, the *August Order* found that Scott, too, had adequately pleaded a Title VI cause of action against Maui County. *Id.* at 26–27.

In favor of summary judgment, Defendants' argue that Mabsenn and Scott's Title VI claims fail because (1) the requisite nexus between a federally-funded program of which Mabsenn and Scott are intended beneficiaries and the alleged discriminatory conduct is lacking, (Memorandum in Support of Motion ("Memo. in Supp."), at 7–8), and (2) there is no evidence that Mabsenn and Scott were discriminated against because of their race, color or national origin, *id.* at 9–12. Plaintiffs counter that "[w]hen federal funds are accepted by a sub-governmental entity, Title VI mandates non-discrimination throughout the entire program[,] not just the portion that directly spent the funds." (Memo. in Opp., at 5).

With respect to the first requirement, there must be some connection between

federal funding and the challenged discriminatory practice, but that nexus is not nearly as limited as Defendants suggest. Section 2000d–4a of Title 42 provides in relevant part:

> For the purposes of this subchapter, the term 'program or activity' and the term 'program' mean all of the operations of—
>
> (1)(A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>
> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a state or local government
> . . . .

42 U.S.C.2000d–4a (1995 & Supp.2003). Section 2000d–4a, part of the Civil Rights Restoration Act of 1987, was enacted to legislatively overrule the narrow interpretation of "program or activity" established in *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). *See, e.g., Hodges by Hodges v. Public Building Comm'n of Chicago*, 864 F.Supp. 1493, 1504–05 (N.D.Ill.1994). The various civil rights statutes, including Title VI, were thereby extended to "the entirety of any state or local institution that had a program or activity funded by the federal government." *Schroeder v. City of Chicago*, 927 F.2d 957, 962 (7th Cir.1991).

Parks and Recreation, the relevant defendant, is a "department" within the meaning of § 2000d–4a. *See* 42 U.S.C. § 2000d–4a(1)(A); *White v. Engler*, 188 F.Supp.2d 730, 747 (E.D.Mich.2001); *Hodges*, 864 F.Supp. at 1506–07. Parks and Recreation receives federal funding. (Affidavit of Glenn T. Correa ("Correa Aff.") ¶ 3, attached as Defendants' Ex. "U"); (Miyazono Aff. ¶ 3). Following the enactment of § 2000d–4a, it is of no moment that the federal funding received is used "solely towards making [Maui] County parks compliant with the Americans with Disabilities Act," (Miyazono Aff. ¶ 3). The receipt of federal funding for that purpose subjects the entire department to the provisions of Title VI. *See* 42 U.S.C. § 2000d–4a(1)(A); *White*, 188 F.Supp.2d at 747; *Hodges*, 864 F.Supp. at 1506–07. Mabsenn and Scott, as citizens of Maui County, applicants before Parks and Recreation and Kalama Park patrons, are the intended beneficiaries of the federal funding.[27] *See National Assoc. for the Adv. of*

---

27. Some courts have rejected the intended beneficiary requirement. *See Alasady v. Northwest Airlines Corp.*, Civ. No. 02–3669, 2003 WL 1565944, at *13 (D.Minn. March 3, 2003), 2003 U.S. Dist. Lexis 3841, at *41–42. *But see Commodari v. Long Island Univ.*, 89 F.Supp.2d 353, 378 (E.D.N.Y.2000). The Court is sympathetic to that position, as the intended beneficiary requirement is a judicially-created limitation and not found anywhere in the statute. Nevertheless, *Fobbs*—a post–1988 decision—cited approvingly to *Wrenn*, which expressly held that such a requirement existed. *See Fobbs*, 29 F.3d at 1447; *see also United States v. El Camino Comm. College*, 600 F.2d 1258, 1260 (9th Cir.1979) (recognizing (in a pre–1988 case) the intended beneficiary requirement). The Ninth Circuit has not overruled either *Fobbs* or *El Camino* on this point and, until it does, the Court is bound by their holdings. The Court will not interpret the intended beneficiary requirement in an unnecessarily restrictive manner, however. *See NAACP*, 599 F.2d at 1252; *Alasady*, 2003 WL 1565944, at 13, 2003 U.S. Dist. Lexis 3841, at *42 (holding that "as Title VI is a remedial statute, the 'zone of interests' to be protected ... must be construed broadly."); *Maloney*, 1987 WL 26146, at * 1, 1987 U.S. Dist. Lexis 11142, at *1–2 (interpreting (in a pre–1988 case) the "intended beneficiaries" of federal funding for an anti-drug task force to be "the residents of Chicago who will have less narcotics on their streets and in their neighborhoods.").

*Colored People v. Medical Center, Inc.*, 599 F.2d 1247, 1252 (3d Cir.1979) [*NAACP* ]; *Maloney v. Washington*, Nos. 84–C–689, 85–C–1905, 1987 WL 26146, at *1 (N.D.Ill. Nov. 30, 1987), 1987 U.S. Dist. Lexis 11142, at *1–2. Thus, the requisite nexus between the receipt of federal funding and the discriminatory conduct at issue is met in this case.

██ Turning to the second element of a Title VI claim, Plaintiffs must establish not only that they were treated differently, but also that Defendants acted with improper discriminatory intent. *See, e.g., Hodges,* 864 F.Supp. at 1501. The observation that Plaintiffs (save EFM) and Buck are of different races is not enough. *Bingham v. City of Manhattan Beach,* 329 F.3d 723, 731 (9th Cir.2003); *Darden v. Alameda County Network of Mental Health Clients,* No. C–95–0783, 1995 WL 616633, at *2–3 (N.D.Ca. Oct. 4, 1995), 1995 U.S. Dist. Lexis 15324, at *6–7. Nor is the bare fact that certain groups were afforded better treatment than EFM. Those groups may likewise have African–American supporters, members or officers. *See Darden,* 1995 WL 616633, at *2–3, 1995 U.S. Dist. Lexis 15324, at *6–7 *Hodges,* 864 F.Supp. at 1501. So, too, Buck may have discriminated against EFM for reasons beyond the protections of Title VI.[28] *See Huebschen v. Department of Health & Social Serv.,* 716 F.2d 1167, 1172 (7th Cir.1983). Accordingly, Plaintiffs' burden to "produce evidence of [impermissible] discriminatory intent" requires something more. *See Bingham,* 329 F.3d at 731; *Hodges,* 864 F.Supp. at 1501.

Plaintiffs have that something in Buck's alleged racial slur. Buck refused a reasonable request to clean Kalama Park by

stating, "You niggers are dirty anyhow. Clean the park yourself." (Collins Decl. I ¶ 18); (Mabsenn Decl. ¶ 27); (Defendants' Ex. "P," at 98:8–13). This comment was made in the context of denying certain Parks and Recreation services and, although occurring after craft vendors were excluded from the May 11, 2002 event, nonetheless evidences a discriminatory intent capable of infecting the entire process.

In *Serrano v. Francis,* 345 F.3d 1071 (9th Cir.2003), the Ninth Circuit held that a similar, if less overtly hostile, statement was sufficient to create a genuine issue of material fact as to discriminatory intent. *Serrano* involved an equal protection challenge to an internal prison disciplinary hearing. *Id.* at 1075–1077. The plaintiff claimed that he was denied the right to call witnesses in his defense and to cross-examine the complainant because of the racial bias of the hearing officer. *Id.* at 1082–83. On a motion for summary judgment, the district court found no direct evidence of discriminatory intent and dismissed the case. *Id.*

In reversing the district court, the Ninth Circuit pointed to two statements by the hearing officer: first, in response to a rhetorical and racially-charged question from the prisoner, the officer replied, "I don't know how black people think, and I'll never know. I don't know why a guy would stab his wife and her friend to death." *Id.* Second, when challenged as to his refusal to allow the prisoner to present witnesses, the officer stated that "he was treating [the prisoner] like everyone else ... and that [the prisoner] was 'not O.J. Simpson or Johnnie Cochran.'" *Id.* at 1083. The court reasoned that the foregoing state-

---

**28.** For instance, the government may decide to grandfather certain groups into a new program, *Haves v. City of Miami,* 52 F.3d 918, 922 (11th Cir.1995), or to enforce a "law against [certain groups] (even just one) to establish precedent, ultimately leading to widespread compliance," *Falls v. Town of Dyer,* 875 F.2d 146, 148–49 (7th Cir.1989); *accord Albright v. Oliver,* 975 F.2d 343, 348 (7th Cir.1992).

ments were "racially tinged" and, therefore, sufficient to "convince a reasonable trier of fact by a preponderance of the evidence that the decision not to allow live witness testimony was racially motivated." *Id.*

Buck's alleged statement is far more "racially tinged" than those at issue in *Serrano.* It is direct evidence of racial hostility and, taken together with circumstantial evidence that EFM was treated less favorably than other groups, creates a genuine issue of material fact as to Buck's motives.[29] *See Serrano,* 345 F.3d at 1082–83; *cf. Desert Palace, Inc. v. Costa,* 539 U.S. 90, ——, 123 S.Ct. 2148, 2154, 156 L.Ed.2d 84 (2003) (holding that circumstantial evidence alone may establish discriminatory intent); *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 147–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (same). Viewing the foregoing evidence in the light most favorable to Plaintiffs, a rational trier of fact could find that Mabsenn and Scott were excluded from participation in, denied the benefits of or subjected to discrimination under a program or activity receiving federal financial assistance.[30]

Summary judgment is DENIED as to Count I.

**29.** A Title VI action is, of course, against the entity and not the individual. *See Buchanan v. City of Bolivar,* 99 F.3d 1352, 1356 (6th Cir.1996); *cf. Cuffley v. Mickes,* 208 F.3d 702, 710 (8th Cir.2000). But an entity does not act without an actor, and Buck is the relevant actor in this case.

**30.** The cases that Defendants rely on for support are inapposite. *See Thompson v. Board of the Special Sch. Dist. No. 1,* 144 F.3d 574 (8th Cir.1998) (affirming the district court's grant of summary judgment because the plaintiff produced "no evidence that race was the motivating factor in his suspension" from school); *Buchanan,* 99 F.3d at 1356–57 (affirming the district court's grant of summary

## II. *Intentional Infliction of Emotional Distress*

Plaintiffs' third count presents a cause of action for intentional infliction of emotional distress ("IIED"). An IIED claim requires (1) an intentional and (2) unreasonable act (3) "that the actor should have recognized . . . was likely to result in illness" to the plaintiff. *Dunlea v. Dappen,* 83 Hawai'i 28, 924 P.2d 196, 206 (1996) (quoting *Marshall v. University of Hawaii,* 9 Haw.App. 21, 821 P.2d 937, 947 (1991)).

For an act to be unreasonable, it must be " 'without just cause or excuse and beyond all bounds of decency . . . .' " *Chedester v. Stecker,* 64 Haw. 464, 643 P.2d 532, 535 (1982) (quoting *Fraser v. Morrison,* 39 Haw. 370, 375 (1952)). "In other words, the act complained of must be 'outrageous' . . . ." *Ross v. Stouffer Hotel Co., Ltd., Inc.,* 76 Hawai'i 454, 879 P.2d 1037, 1048 (1994). In defining the term "outrageous," the *Ross* court quoted approvingly from the Restatement (Second) of Torts § 46 (1965), which provides:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice" . . . . Liability has

judgment because the plaintiff (1) produced no evidence that the discriminating entity received federal funds, (2) had named the wrong defendants and (3) had merely argued, without any supporting documentation, that "her son 'would not have been arrested had he been a Caucasian student.' "). Buck, of course, has averred that race "played absolutely no role in the decision to not allow craft vendors at the [EFM] event on May 11, 2002." (Buck Aff. ¶ 16). But, unlike the plaintiff in *Buchanan,* Plaintiffs responded with evidence (of the kind found sufficient in *Serrano* ) of racial hostility. Taken as true, this evidence calls Buck's motives into question.

been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Restatement (Second) of Torts § 46 cmt. d.

A plaintiff also bears a heavy burden in showing the requisite mental harm. Emotional distress may be found only "where a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Shoppe v. Gucci Am., Inc.,* 94 Hawai'i 368, 14 P.3d 1049, 1068 (2000) (quoting *Rodrigues v. Hawaii,* 52 Haw. 156, 472 P.2d 509, 520 (1970)). Sensitivities peculiar to a particular plaintiff are irrelevant unless the same are known to the tortfeasor. *See, e.g., Alcorn v. Anbro Eng'g, Inc.,* 2 Cal.3d 493, 86 Cal. Rptr. 88, 468 P.2d 216, 218–19 (1970); *see also* Restatement (Second) Torts § 46 cmt. f.

In reviewing IIED claims, Hawaii courts hold that the question of "whether the complaint states facts which, if proved, would permit the case to go to the jury is for the judge ...." *Id.* at 377, 14 P.3d 1049; *accord Wong v. Panis,* 7 Haw.App. 414, 772 P.2d 695, 700 (1989). It is only "where reasonable persons may differ" that the cause of action should proceed to trial. *Fraser,* 39 Haw. at 377; *accord Wong,* 772 P.2d at 700.

The *March Order* allowed Mabsenn's IIED claim to move forward against Buck but dismissed the remaining claims, with prejudice as to EFM and without prejudice as to the other plaintiffs. *Id.* at 69. In the *August Order,* the Court affirmed that Mabsenn had adequately pleaded an IIED claim and held that Scott and Collins

had stated causes of action against Buck for intentional infliction of emotional distress as well. *Id.* at 39. The Court further concluded that Maui County may be held vicariously liable for Buck's intentional tort (assuming his liability) if the facts show that Buck was acting within the scope of his employment when the tortious conduct occurred. *Id.* Plaintiffs' remaining claims were dismissed with prejudice. *Id.*

In support of summary judgment, Defendants argue that Mabsenn, Scott and Collins' IIED claims fail as a matter of law because (1) there is no evidence that Mabsenn, Scott or Collins suffered emotion distress as a result of Buck's tortious conduct, (Memo. in Supp., at 12–13), and (2) a racial slur, standing alone, does not give rise to an IIED claim, *id.* at 13–15. Plaintiffs offer no response.

To recover on an IIED claim, a plaintiff must demonstrate the requisite degree of emotional distress to the satisfaction of the trier of fact. *See Shoppe,* 14 P.3d at 1068; *Lee v. Aiu,* 85 Hawai'i 19, 936 P.2d 655, 670 (1997); *Dunlea,* 924 P.2d at 206. Accordingly, Plaintiffs were required to come forward with at least some evidence of emotional distress in opposition to Defendants' Motion for Summary Judgment. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *T.W. Elec. Serv.,* 809 F.2d at 630. That burden notwithstanding, Plaintiffs failed to produce any evidence (or even argument) concerning the emotional distress suffered by Mabsenn, Scott or Collins as a result of Buck's racial slur and acts of discrimination. Indeed, the evidence, what little there is, indicates that Buck's actions did not result in a judicially-cognizable illness.[31] *See* Defendants' Exs. "Q," at 96:3–4; "R," at 97:15–25; "S," at 30:15–21. Having failed in their burden of

---

**31.** The Court leaves unresolved Defendants' argument that a racial slur of the nature and

in the context uttered here does not constitute "outrageous" conduct.

production as to a critical element, no genuine issue of material fact remains.

Summary Judgment is GRANTED as to Count III.

### III. *Section 1983*

■ Plaintiffs' sixth cause of action invokes 42 U.S.C. § 1983.[32] Section 1983 provides in relevant part:

Every person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (Supp.2002).

A § 1983 claim requires that "(1) acts by the defendants (2) under color of state law (3) depriv[ed] [the plaintiff] of federal rights, privileges or immunities [and] (4) caus[ed][him] damage." *Shoshone–Bannock Tribes v. Idaho Fish & Game Comm'n,* 42 F.3d 1278, 1284 (9th Cir.1994). As should be evident from the text of the statute, § 1983 " 'is not a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.' " *Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Accordingly, a plaintiff must demonstrate "that the conduct [complained of] deprived [him] of some right, privilege, or immunity protected by the Constitution or laws of the United States." *Thomas v. Nakatani,* 128 F.Supp.2d 684, 694 (D.Haw.2000); *accord Albright,* 510 U.S. at 271, 114 S.Ct. 807;

*Wright v. El Paso County Jail,* 642 F.2d 134, 135 (5th Cir.1981).

The *March Order* dismissed Plaintiffs' § 1983 claims without prejudice and granted Plaintiffs leave to amend. *Id.* at 64. In the *August Order,* the Court reviewed Plaintiffs' Second Amended Complaint and held that EFM, Mabsenn, Scott and Collins had stated § 1983 claims against Buck for violations of the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 60. All remaining claims were dismissed with prejudice.

In support of summary judgment, Defendants maintain that EFM, Mabsenn, Scott and Collins' § 1983 claims fail because there is no evidence of intentional racial discrimination. Plaintiffs disagree, of course, but argue only that "Defendants have already admitted that they violated Plaintiff[s'] Fourth and Fourteenth Amendment Constitutional Rights to be free from [an] unreasonable taking of their property without Due Process of Law." (Memo. in Opp. at 12–13).

The Fourth Amendment to the U.S. Constitution is not and has never been at issue in this action. Nor have Defendants admitted that they violated Plaintiffs' due process rights. Indeed, the *August Order* dismissed Plaintiffs' due process claims with prejudice. *Id.* at 48–49. As stated in the preceding paragraphs, what remains are the equal protection claims brought be EFM, Mabsenn, Scott and Collins.

The Equal Protection Clause protects against intentional discrimination based upon a person's race or ethnicity. *Serrano,* 345 F.3d at 1081–82. "Intentional discrimination" means that a defendant was motivated, at least in part, by racially discriminatory reasons. *Maynard v. City of San Jose,* 37 F.3d 1396, 1404 (9th Cir.

---

**32.** The Second Amended Complaint misnumbers this count as "Count VII."

1994). Accordingly, to avoid summary judgment, Plaintiffs "must produce evidence sufficient to permit a reasonable trier of fact to find by a preponderance of the evidence that the [challenged action] was racially motivated." *Bingham,* 329 F.3d at 732; *accord Buchanan,* 99 F.3d at 1360.

For the reasons discussed *supra,* Plaintiffs have produced sufficient evidence to create a genuine issue of material fact with regard to Buck's motives for denying craft vendors at the May 11, 2002 event and for refusing to clean Kalama Park when requested. *See supra* at 1012–14. Viewed in the light most favorable to Plaintiffs and taken together with evidence that other groups were treated more favorably than EFM, a rational trier of fact could find that Buck discriminated against EFM, Mabsenn, Scott and Collins in violation of the Equal Protection Clause.[33] Defendants do not contest the remaining elements of a § 1983 claim arising from the denial of equal protection.

Summary judgment is DENIED as to Count VI.

## IV. Chapter 489

Plaintiffs' seventh count arises under Hawaii Revised Statutes chapter 489.[34] Chapter 489 was enacted "to protect the interests, rights, and privileges of all persons within the State with regard to access and use of public accommodations by prohibiting unfair discrimination." Haw.Rev. Stat. § 489–1 (2002). The applicable section, 489–5, provides in relevant part:

> It is discriminatory practice to deny a person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation because of the known disability of an individual with whom the person is known to have a relationship or association.

Haw.Rev.Stat. § 489–5(b) (2002).

██ The term "place of public accommodation" includes public parks. *March Order,* at 74–75. Any person aggrieved by the above discriminatory practice may "[s]ue for damages sustained, and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is greater, and reasonable attorneys' fees together with the costs of suit ...."[35] Haw.Rev. Stat. § 489–7.5 (2002).

---

**33.** The injuries giving rise to Title VI and equal protection claims are somewhat different. *Compare August Order,* at 25–27, *with id.* at 54–58. For equal protection, the injury is being discriminated against by the state for an impermissible reason. *See id.* at 63 n. 39. For Title VI, the injury arises when a person is excluded from participation in, denied the benefits of or subjected to discrimination under any program or activity receiving federal funding because of race, color or national origin. *See* 42 U.S.C. § 2000d. Accordingly, the underlying facts in Plaintiffs' Title VI and equal protection claims (and the parties with standing to assert those claims) are not perfectly parallel. But the evidence of intentional discrimination—the racial slur directed toward or witnessed by each of the three individual plaintiffs—satisfies Plaintiffs' burden as to motive for both claims. As discussed *supra* note 31, Buck's averment that he did not discriminate against Plaintiffs

on the basis of race serves only to create a genuine issue of material fact.

**34.** The Second Amended Complaint misnumbers this count as "Count VIII."

**35.** Defendants argue that Plaintiffs may not pursue their claim for relief under chapter 489 because Plaintiffs did not first file a complaint with the Hawaii Civil Rights Commission (HCRC). (Memo. in Supp., at 22–23). Section 489–6 provides, in part, that the HCRC "shall receive complaints of unfair discriminatory treatment in public accommodations in accordance with the procedures established under chapter 368 ...." Haw.Rev. Stat. § 489–6 (2002). Chapter 368 in turn grants the HCRC "jurisdiction over the subject of discriminatory practices made unlawful by part I of chapter 489," Haw.Rev.Stat. § 368–11(a), and authorizes the HCRC to investigate complaints, Haw.Rev.Stat. § 368–3

The *March Order* allowed EFM's chapter 489 claim against Buck to proceed pursuant to § 489–5(b) and granted Plaintiffs leave to amend in remaining part. *Id.* at 79. In the *August Order,* the Court affirmed that EFM had stated a cognizable claim against Buck under § 489–5(b), *id.* at 65, but dismissed the other chapter 489 claims with prejudice, *id.* at 63–65. The Court left the issue of Maui County's liability for another time.[36] *Id.*

■ In support of summary judgment, Defendants argue that EFM's § 489–5(b) claim fails because Plaintiffs did not produce evidence showing that Buck discriminated against EFM in violation of the statute. Plaintiffs offer no opposition.

By its plain language, § 489–5(b) applies only to discrimination in a place of accommodation practiced "because of the known disability of an individual with whom the person is known to have a relationship or association." Haw.Rev.Stat. § 489–5(b). Plaintiffs have not demonstrated that Buck intentionally discriminated against EFM because of EFM's association with a person known to have a disability. The naked observation that other groups were allowed to use Kalama Park for craft fairs is not enough—again, those groups, too, may have disabled supporters, members or officers. To be sure, that was true of Plaintiffs' racial discrimination claims as well but, unlike those claims, Plaintiffs offered nothing to indicate that Buck is hostile toward the disabled in general or those suffering with epilepsy in particular. Without such evidence, Plaintiffs' claim that Buck denied EFM the full and equal enjoyment of a place of public accommodation because of EFM's association with persons known to be disabled is totally

(1999 & Supp.2002), conduct hearings, Haw. Rev.Stat. § 368–14 (1999), and order relief, Haw.Rev.Stat. § 368–17 (1999 & Supp.2002). The HCRC may also "issue a notice of right to sue upon written request of the complainant. Within ninety days after receipt of notice of right to sue, the complainant may bring a civil action under this chapter." Haw.Rev. Stat. § 368–12 (1999 & Supp.2002).

Defendants read the jurisdictional statement and the right to sue provision as requiring persons discriminated against in violation of chapter 489 to first file a complaint with the HCRC. (Memo. in Supp., at 22–23). The Court disagrees. Nothing in either chapter 489 or chapter 368 expressly circumscribes a plaintiff's right to pursue the remedies provided by § 489–7.5. Section 489–7.5 states, without limitation, "Any person who is injured by an unlawful discriminatory practice . . . may: (1) Sue for damages sustained . . . ." Haw. Rev.Stat. § 489–7.5. Defendants reading of § 489–6 contradicts the plain language of § 489–7.5. Furthermore, the right to sue provision cited by Defendants and found in chapter 368 allows the complainant to "bring a civil action under this chapter." Haw.Rev. Stat. § 368–12. As discussed, however, Plaintiffs need not rely on chapter 368 for authorization to bring suit. They have a separate and distinct remedy under chapter 489.

"[S]tatutory language must be read in the context of the entire statute and construed in a manner consistent with the purposes of the statute." *Waikiki Resort Hotel, Inc. v. City & County of Honolulu,* 63 Haw. 222, 624 P.2d 1353, 1369 (1981) (quoting *Hawaii v. Sylva,* 61 Haw. 385, 605 P.2d 496 (1980)). The context of chapters 368 and 489 the plain language of § 489–7.5 leads the Court to conclude that a plaintiff injured in violation of chapter 489 may either bring a civil action pursuant to § 489–7.5 or seek administrative relief. *Cf. Doe v. Kahala Dental Group,* 72 Haw. 150, 808 P.2d 1276 (1991) (reviewing a chapter 489 claim filed in state circuit court). Under the latter option, the HCRC is vested with jurisdiction, and the complainant must proceed as provided by chapter 368. In this case, however, Plaintiffs selected a direct action in a court of competent jurisdiction.

**36.** In *Hawaii v. Hoshijo,* 102 Hawai'i 307, 76 P.3d 550 (2003), discussed *infra,* the Hawaii Supreme Court held that employers may be found vicariously liable under the doctrine of *respondeat superior* for acts of discrimination committed by their employees or agents in violation of chapter 489. 76 P.3d at 561.

devoid factual support. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Matsushita Elec.,* 475 U.S. at 586, 106 S.Ct. 1348; *California Arch. Bldg. Prods.,* 818 F.2d at 1468.

■ This would be the end of the discussion but for the Hawaii Supreme Court's recent decision in *Hoshijo.* In footnote to *Hoshijo,* the court—relying on a single Oregon case—concluded that "an employee[ ] or agent's use of a racial slur may constitute unfair discrimination under ... chapter 489."[37] 102 Hawai'i at 317 n. 22, 76 P.3d 550. The court proceeded to uphold awards entered against the University of Hawaii and its agent for a racial slur and threat made by the agent against the plaintiff during a basketball game at the University of Hawaii Special Events Arena. *Id.* 76 P.3d at 565.

As discussed *supra,* the *August Order* dismissed the claims brought by Mabsenn, Scott and Collins under chapter 489 because, under existing law, it appeared that a racial slur, standing alone, did not amount to the denial of the full and equal enjoyment of a place of public accommodation. *Id.* at 63. Although true when entered, *Hoshijo* altered the legal landscape. In light of *Hoshijo,* the Court will review whether Mabsenn, Scott or Collins have stated claims under chapter 489.[38]

Hawaii Revised Statutes § 489–3 prohibits discriminatory practices that "deny, or attempt to deny, a person the full and equal enjoyment of the goods, facilities, privileges, advantages, and accommodations of a place of public accommodation on the bases of race ...." Haw.Rev.Stat. § 489–3 (2002 & Supp.2002). Under *Hoshijo,* a racial slur may constitute discrimination. 102 Hawai'i, at 317 n. 22, 76 P.3d 550. Buck allegedly made a racial slur (comparable to that uttered in *Hoshijo* ) that was either directed at or witnessed by Mabsenn, Scott and Collins. (Collins Decl. I ¶ 18); (Mabsenn Decl. ¶ 27); (Defendants' Ex. "P," at 98:8–13). As in *Hoshijo,* the slur was uttered in the context of the individual plaintiffs use and enjoyment of a place of public accommodation. For the reasons discussed *supra,* the slur evidences discriminatory intent. Nothing more is required in opposition to summary judgment.[39]

As noted *supra, Hoshijo* also answers the question of Maui County's liability under chapter 489. Maui County may be held vicariously liable pursuant to the doctrine of *respondeat superior* for Buck's violation of § 489–3 if Buck was acting within the scope of his employment when he made the alleged racial slur. *See id.* at 561.

Summary judgment on Count VII is GRANTED with respect to EFM's claims under § 489–5(b). Mabsenn, Scott and Collins' claims against Buck and Maui County under § 489–3 are REINSTATED in light of *Hoshijo.*

37. The issue of whether a racial slur constitutes discrimination under chapter 489 was not raised by the parties on appeal, *see Hoshijo,* 102 Hawai'i at 317 n. 22, 76 P.3d 550, but, given the tenor and outcome in *Hoshijo,* it seems clear that the court would conclude an epithet of the kind and in the context uttered here gives rise to a chapter 489 claim.

38. The *August Order* also dismissed Andrea Buphart–Smith's chapter 489 claim. *Id.* at 63. Buphart–Smith is not a member of the ethnicity slurred and, therefore, *Hoshijo* 's broad reading of chapter 489 does not apply.

39. Chapter 489 provides for treble damages. "[A] plaintiff who succeeds on a statutory claim that awards treble damages and on a common law claim for which punitive damages are available cannot recover both treble and punitive damages if the same conduct gave rise to both claims." *March Order,* at 54.

## CONCLUSION

In light of the foregoing, the Court GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment.

Genuine issues of material fact remain as to whether racial animus contributed, at least in part, to Buck's decision to exclude craft vendors from the May 11, 2002 "Epilepsy Awareness Event" and refusal to provide cleaning services for the same when requested. Accordingly, summary judgment is DENIED as to Plaintiffs Mabsenn and Scott's causes of action arising under Title VI against Maui County (Count I) and as to Plaintiffs EFM, Mabsenn, Scott and Collins' equal protection claims (including claims for punitive damages) arising under § 1983 (Count VI).

In Light of *Hoshijo*, Mabsenn, Scott and Collins' claims against Buck and Maui County under § 489-3 are hereby REINSTATED.

Plaintiffs failed to produce evidence in support of essential elements of their claims for intentional infliction of emotional distress (Count III) and discrimination in violation of Haw.Rev.Stat. 489-5(b) (Count VII). Summary judgment is therefore GRANTED in remaining part.

The parties are directed to appear before this Court at 10:00 a.m. on October 16, 2003, for the final pretrial conference.

IT IS SO ORDERED.